Anthony M. Barnes (Bar No. 199048)
Jason Flanders (Bar No. 238007)
Email: amb@atalawgroup.com
AQUA TERRA AERIS LAW GROUP LLP
4030 Martin Luther King Jr. Way
Oakland, CA 94609
Phone: (917) 371-8293

Kelly Clark (Bar No. 312251)
Email: kelly@lawaterkeeper.org
LOS ANGELES WATERKEEPER
120 Broadway
Santa Monica, CA 90401
Phone: (310) 394-6162

*Attorneys for Plaintiff*
LOS ANGELES WATERKEEPER

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES WATERKEEPER, a California non-profit association, <br><br> Plaintiff, <br><br> v. <br><br> JOHNSON & JOHNSON CONSUMER INC, a New Jersey corporation, <br><br> Defendant. | Civil Case No.: 2:21-cv-3148 <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** <br><br> **(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*)** |

LA Waterkeeper ("LA Waterkeeper" or "Plaintiff"), by and through its counsel, hereby alleges:

## I.   <u>JURISDICTION AND VENUE</u>

1.     This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.     On August 12, 2020, LA Waterkeeper issued a 60-day notice letter ("Notice Letter") to Johnson & Johnson Consumer Inc ("Defendant" or "JJCI"), for a Neutrogena facility under its control. The Notice Letter informed Defendant of alleged violations of California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollutant Discharge Elimination System (NPDES) General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No.* 2014-0057-DWQ and amended by Order No. 2015-0122 –DWQ and amended by Order No. 2015-0122-DWQ incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) TMDL Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use ("Strom Water Permit"), and the Clean Water Act at the JJCI facility located at 5755 W. 96th Street, Los Angeles, CA 90045 and 5760 W. 96th Street, Los Angeles, CA 90045 with Waste Discharger Identification Number (WDID) 4 19I010364 ("Facility").

3.     The Notice Letter informed Defendant of LA Waterkeeper's intent to file suit against Defendant to enforce the Storm Water Permit and the Clean Water Act.

4.     The Notice Letter was sent to Defendant's Chief Executive Officer, Michelle W. Goodridge, Curt Syring, Site Director, and Andrew Washington, Environmental Health Safety & Sustainability (40 C.F.R. § 135.2(a)(2)). The Notice Letter was also sent to the Acting Administrator of the United States Environmental Protection Agency

("EPA"), the Acting Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Water Quality Control Board, Los Angeles Region, ("Regional Board") as required by Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A). The Notice Letter is attached hereto as **Exhibit A** and is fully incorporated herein by reference.

5.     More than sixty (60) days have passed since the Notice Letter was served on the Defendant and the State and Federal agencies. LA Waterkeeper is informed and believes, and thereon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA, 33 U.S.C. § 1319(g).

6.     Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the alleged violations are located within this judicial district.

## II.     INTRODUCTION

7.     With every rainfall event, hundreds of millions of gallons of potentially-polluted rainwater, originating from industrial operations such as the Facility referenced herein, pour into the storm drains and local waterways. The consensus among regulatory agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering marine and river environments each year. These surface waters, known as Receiving Waters, are ecologically sensitive areas. Although pollution and habitat destruction have drastically diminished once abundant and varied fisheries, these waters are still essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. Storm water and non-storm water contain sediment, heavy metals, such as aluminum, iron, chromium, copper, lead, mercury, nickel, and zinc, as well as, high concentrations of nitrate and nitrite, and other pollutants. Exposure to polluted storm water harms the special aesthetic and recreational

significance that the surface waters have for people in the surrounding communities. The public's use of the surface waters exposes many people to toxic metals and other contaminants in storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to the Receiving Waters.

8.      High concentrations of total suspended solids ("TSS") degrade optical water quality by reducing water clarity and decreasing light available to support photosynthesis. TSS has been shown to alter predator-prey relationships (for example, turbid water may make it difficult for fish to hunt prey). Deposited solids alter fish habitat, aquatic plants, and benthic organisms. TSS can also be harmful to aquatic life because numerous pollutants, including metals and polycyclic aromatic hydrocarbons ("PAHs"), are absorbed onto TSS. Thus, higher concentrations of TSS result in higher concentrations of toxins associated with those sediments. Inorganic sediments, including settleable matter and suspended solids, have been shown to negatively impact species richness, diversity, and total biomass of filter feeding aquatic organisms on bottom surfaces.

9.      Storm water discharged with high pH can damage the gills and skin of aquatic organisms and cause death at levels above 10 standard units. The pH scale is logarithmic and the solubility of a substance varies as a function of the pH of a solution. A one-whole-unit change in SU represents a tenfold increase or decrease in ion concentration. If the pH of water is too high or too low, the aquatic organisms living within it will become stressed or die.

10.      This complaint seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorney and expert witness fees, for Defendant's substantive and procedural violations of the Storm Water Permit and the Clean Water Act resulting from Defendant's operations at the Facility.[1]

---

[1] The Facility are fully described in Section V below.

Complaint for Declaratory and Injunctive      4
and Civil Penalties Relief

11.     LA Waterkeeper specifically alleges violations regarding Defendant's discharge of pollutants from the Facility into waters of the United States; violations of the filing, monitoring and reporting, and best management practice requirements; and violations of other procedural and substantive requirements of the Storm Water Permit and the Clean Water Act, are ongoing and continuous.

### III.     PARTIES

#### A.     Los Angeles Waterkeeper

12.     LA Waterkeeper is a non-profit 501(c)(3) public benefit corporation organized under the laws of the State of California. LA Waterkeeper's main office is located at 120 Broadway, Santa Monica, California 90401.

13.     LA Waterkeeper has hundreds of members who live and/or recreate in and around Los Angeles. LA Waterkeeper is dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of local surface waters. To further these goals, LA Waterkeeper actively seeks federal and state agency implementation of the Clean Water Act and, where necessary, directly initiates enforcement actions on behalf of itself and others.

14.     LA Waterkeeper members live, work, travel near, recreate in, use and enjoy the waters near the Facility, including the Dominguez Channel, Dominguez Channel Estuary, the Los Angeles Harbor, and the Pacific Ocean ("Receiving Waters"), for biking, boating, kayaking, bird watching, viewing wildlife, hiking, walking, running, and engaging in scientific study, including pollution and habitat monitoring and restoration activities.

15.     Discharges of polluted storm water and non-storm water from the Facility degrade water quality and harm aquatic life in the Receiving Waters and impair LA Waterkeeper's and its members' use and enjoyment of those waters.

16.     The violations of the Storm Water Permit and Clean Water Act at the Facility are ongoing and continuous, including but not limited to Defendant's discharge of polluted storm water from the Facility. Thus, the interests of LA Waterkeeper's

members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Storm Water Permit and the Clean Water Act.

17.    Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and its members, for which they have no plain, speedy or adequate remedy at law.

18.    The interests of LA Waterkeeper and LA Waterkeeper's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the Storm Water Permit. The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

### B.    Defendant is the Facility's Operator

19.    LA Waterkeeper is informed and believes, and thereon alleges, that Defendant maintains its headquarters at 199 Grandview Road, Skillman, NJ 08558.

20.    LA Waterkeeper is informed and believes, and thereon alleges, that Defendant is the operator of the Facility.

21.    LA Waterkeeper refers to Defendant and its management herein as the "Operators" of the Facility.

22.    LA Waterkeeper is informed and believes, and thereon alleges, that Defendant is an active California corporation registered in New Jersey.

23.    LA Waterkeeper is informed and believes, and thereon alleges, that the name and address of the Registered Agent for Johnson & Johnson Consumer, Inc. is CT Corporation System, 818 West Seventh Street, Suite 930, Los Angeles, CA 90017.

## IV.    STATUTORY BACKGROUND

### A.    The Clean Water Act

24.    Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section

402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

25.     Section 402(p) of the CWA establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342.

26.     Section 301(b) of the Clean Water Act requires that, by March 31, 1989, all point source dischargers, including those discharging polluted storm water, must achieve technology-based effluent limitations by utilizing Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. *See* 33 U.S.C. § 1311(b); 40 C.F.R. § 125.3(a)(2)(ii)-(iii).

27.     The Clean Water Act requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).

28.     The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see* 40 C.F.R. § 122.2.

29.     The term "pollutant" includes "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); *see* 40 C.F.R. § 122.2.

30.     The term "point source" means any "discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. §

1362(14); *see* 40 C.F.R. § 122.2.

31.    "Navigable waters" means "the waters of the United States." 33 U.S.C. 1362(7).

32.    "Waters of the United States" are defined as "navigable waters," and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7).

33.    The EPA promulgated regulations for the Section 402 NPDES permit program defining "waters of the United States." *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce.

34.    The Clean Water Act confers jurisdiction over non-navigable waters that are tributaries to traditionally navigable waters where the non-navigable water at issue has a significant nexus to the navigable water. *See Rapanos v. United States*, 547 U.S. 715 (2006); *see also N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007).

35.    A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." *Rapanos*, 547 U.S. at 779; *N. Cal. River Watch*, 496 F.3d at 999-1000.

36.    A significant nexus is also established if waters that are tributary to navigable waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. *Rapanos*, 547 U.S. at 782; *N. Cal. River Watch*, 496 F.3d at 1000-1001.

37.    Section 505(a)(1) and Section 505(f) of the Clean Water Act provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with

respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i) and 1365(f).

38.   The Defendants are "person[s]" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

39.   An action for injunctive relief is authorized under Section 505(a) of the CWA, 33 U.S.C. § 1365(a).

40.   Pursuant to sections 309(d) and 505 of the Clean Water Act, each separate violation of the CWA $37,500 per day per violation for all Clean Water Act violations after January 12, 2009 and $55,800.00 per day per violation for violations that occurred after November 2, 2015. *See* 33 U.S.C. §§ 1319(d) and 1365(a); 40 C.F.R. § 19.4 (Adjustment of Civil Monetary Penalties for Inflation).

41.   Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees, and consultants' fees.

### B.   California's Storm Water Permit

42.   Section 402(b) of the CWA, 33 U.S.C. § 1342(b), allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to dischargers and/or through the issuance of a statewide general NPDES permit applicable to all industrial storm water dischargers. *See id.*

43.   Pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, the Administrator of the EPA has authorized California to issue NPDES permits, including general NPDES permits. California has designated the State Board and the Regional Water Quality Control Boards to administer its NPDES program. *City of Rancho Cucamonga v. Regional Water Quality Control Bd.*, 135 Cal. App. 4th 1377, 1380-81 (2006). In California, the State Board is charged with regulating pollutants to protect California's water resources. *See* Cal. Water Code § 13001.

44.     The Storm Water Permit is a statewide general NPDES permit issued by the State Board pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1342(b), (p), and 40 C.F.R § 123.25. Violations of the Storm Water Permit are also violations of the CWA. Storm Water Permit, Section XXI(A).

45.     Section 303 of the CWA, 33 U.S.C. § 1313, requires states to adopt Water Quality Standards, including water quality objectives and beneficial uses for navigable waters of the United States. The CWA prohibits discharges from causing or contributing to a violation of such state Water Quality Standards. *See* 33 U.S.C. § 1313(b)(1)(c); 40 C.F.R. §§ 122.4(a), (d); 40 C.F.R. §§ 122.44(D)(1).

46.     The State Board elected to issue a statewide general permit for industrial discharges. The State Board issued the Storm Water Permit on or about November 19, 1991, modified the Storm Water Permit on or about September 17, 1992, and reissued the Storm Water Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

47.     On July 1, 2015, the current Storm Water Permit became effective and was issued as NPDES General Permit No. CAS000001 Order No. 2014-0057-DWQ. Storm Water Permit, Section I(A) (Finding 4).

48.     On November 6, 2018, the State Board amended the Storm Water Permit with Order No. No. 2015-0122 –DWQ, incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) TMDL Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use ("2018 Permit Amendment").

49.     In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the Storm Water Permit and comply with its terms, or obtain and comply with an individual NPDES permit. Storm Water Permit, Section I(A) (Findings 8, 12). Prior to beginning industrial operations, dischargers are required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water

Associated with Industrial Activity ("NOI") to the State Board. Storm Water Permit, Section I(A) (Finding 17), Section II(B).

50.     Section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), provides for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i), 1365(f).

### C.     The Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations

51.     The Storm Water Permit contains certain absolute prohibitions. The Storm Water Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. Storm Water Permit, Discharge Prohibition III(B).

52.     Effluent Limitation V(A) of the Storm Water Permit requires dischargers to reduce or prevent pollutants associated with industrial activity in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biological oxygen demand ("BOD"), TSS, oil and grease ("O&G"), pH, and fecal coliform.

53.     Discharge Prohibition III(C) of the Storm Water Permit prohibits storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

54.     Under the CWA and the Storm Water Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b). Storm Water Permit, Effluent Limitation V(A). EPA has developed benchmark levels ("Benchmarks") that are objective guidelines to evaluate whether a permittee's BMPs achieve compliance with the

1   BAT/BCT standards. *See* Final National Pollutant Discharge Elimination System
2   (NPDES) General Permit for Storm Water Discharges From Industrial Activities ("Multi-
3   Sector Permit"), 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); Multi-Sector Permit, 73
4   Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); Multi-Sector Permit, 65 Fed. Reg. 64,746,
5   64,766-67 (Oct. 30, 2000).

6       55.     The EPA established Parameter Benchmark Values for the following
7   parameters, among others, are as follows: total suspended solids ("TSS")—100 mg/L; oil
8   & grease ("O&G")—15 mg/L; aluminum ("Al")—.75 mg/l; iron ("Fe")—1 mg/l;
9   cadmium ("Cd")—0.0018 mg/L; copper ("Cu")—.0123 mg/l; zinc ("Zn")—.11 mg/L;
10  pH—6-9 s.u.; and nitrate & nitrite nitrogen ("N+N")—0.68 mg/L. The Basin Plan's
11  Water Quality Standards for the Los Angeles Region requires a narrower pH range of
12  6.5—8.5 pH units. The Storm Water Permit contains Numeric Action Levels ("NALs")
13  for these same parameters that generally mirror the Benchmark Values.

14      56.     The Storm Water Permit includes NALs. Storm Water Permit, Section I(M)
15  (Finding 62). During the public commenting period, the State Board stated that "NALs
16  are not designed or intended to function as numeric technology-based effluent
17  limitations." State Board 2012 Draft Industrial General Permit Response to Comments,
18  Response #6 to Comment #12; *see also* Storm Water Permit Section I(M) (Finding 63).

19      57.     The 2018 Permit Amendment implemented Numeric Effluent Limits
20  ("NELs") which the Facility are subject to following implementation of pollutant
21  limitations based upon allowable Total Maximum Daily Loads ("TMDLs") of certain
22  pollutants discharged from industrial facilities to the Dominguez Channel and Los
23  Angeles Harbor. These pollutants include Zn, Cu, and Pb.

24      58.     Receiving Water Limitation VI(B) of the Storm Water Permit prohibit storm
25  water discharges from adversely impacting human health or the environment.

26      59.     Discharges with pollutant levels that exceed levels known to adversely
27  impact aquatic species and the environment are violations of the Storm Water Permit's
28  Receiving Water Limitation.

60.     Receiving Water Limitation VI(A) of the Storm Water Permit prohibit storm water discharges that cause or contribute to an exceedance of any "applicable Water Quality Standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan."

61.     Water Quality Standards ("WQS") are pollutant concentration levels determined by the State Board, the various Regional Boards, and the EPA to be protective of the beneficial uses of the waters that receive polluted discharges.

62.     The State of California regulates water quality through the State Board and the nine Regional Boards. Each Regional Board maintains a separate Water Quality Control Plan which contains WQS for water bodies within its geographic area.

63.     The State Water Quality Control Board, Los Angeles Region, has issued the Water Quality Control Plan for the Los Angeles Region ("the Basin Plan") to establish water quality objectives, implementation plans for point and non-point source discharges, prohibitions, and to further statewide plans and policies. The Basin Plan sets forth water quality objectives for dissolved metals such as aluminum, arsenic, and mercury. Basin Plan, Table 3.8. The Basin Plan states that the waters shall not receive sediment, settleable materials, or suspended materials that cause nuisance or adversely affect the waters' beneficial uses. *Id*. at 3-27. The Basin Plan also provides that "Toxic pollutants shall not be present at levels that will bioaccumulate in aquatic life to levels which are harmful to aquatic life or human health." *Id*. at 3-24.

64.     The Basin Plan specifies potential and/or existing beneficial uses for the Dominguez Channel Estuary as including navigation, commercial and sportfishing, estuarine habitat, marine habitat, wildlife habitat, rare, threatened, or endangered species habitat rare, migration of aquatic organisms, and spawning, reproduction and/or early development. Basin Plan, Table 2-1. The Basin Plan further specifies potential beneficial uses for the Dominguez Channel Watershed from the estuary to above 135th Street as including municipal and domestic supply, warm freshwater habitat, wildlife habitat, and rare, threatened, or endangered species habitat. *Id*.

1    65.    Surface waters that cannot support the Beneficial Uses of those waters listed

2    in the Basin Plan are designated as impaired water bodies pursuant to Section 303(d) of

3    the Clean Water Act.

4    66.    Dominguez Channel is listed for the following water quality impairments on

5    the most recent Clean Water Act Section 303(d)-list: copper, indicator bacteria, lead,

6    toxicity, zinc, benthic community effects, benzo(a)anthracene, benzo(a)pyrene (3,4-

7    benzopyrene -7d), chrysene, PCBs (polychlorinated biphenyls), phenanthrene, and

8    pyrene. Thus, the receiving waters for pollution from the Facility are impaired, and the

9    Defendant's discharges of pollutants above the WQS contributes to the continued

10   impairment of the receiving waters' beneficial uses.

11   67.    In addition, EPA has promulgated WQS for toxic priority pollutants in all

12   California water bodies ("California Toxics Rule" or "CTR"), which apply to the

13   Receiving Waters, unless expressly superseded by the Basin Plan. 65 Fed. Reg. 31,682

14   (May 18, 2000); 40 C.F.R. § 131.38.

15   68.    The CTR sets forth lower numeric limits for zinc and other pollutants; CTR

16   criteria can be as low as 0.067 mg/L for zinc in freshwater surface waters with water

17   hardness calculation of 50 mg/L.[2]

18   69.    The CTR includes further numeric criteria set to protect human health and

19   the environment in the State of California. *See* Establishment of Numeric Criteria for

20   Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008 (April

21   2000), available at: https://www.epa.gov/wqs-tech/water-quality-standards-

22   establishment-numeric-criteria-priority-toxic-pollutants-state.

23   70.    Discharges with pollutant levels in excess of the CTR criteria, the Basin

24   Plan, and/or other applicable WQS are violations of Receiving Water Limitations and

25   Section VI(A) of the Storm Water Permit.

26

27   _____

28   [2] The CTR numeric limits, or "criteria," are expressed as dissolved metal concentrations
     in the CTR, but the Storm Water Permit required permittees to report their sample results
     as total metal concentrations. *See* Storm Water Permit, Attachment H at 18.

     Complaint for Declaratory and Injunctive     14
     and Civil Penalties Relief

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**D.      The Storm Water Permit's Storm Water Pollution Prevention Plan Requirements**

71.      Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") at the time industrial activities begin. Storm Water Permit, Sections I(I) (Finding 54), X(B). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. Storm Water Permit, Section X(G). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. Storm Water Permit, Section X(G). The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges. Storm Water Permit, Section X(H). The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. Storm Water Permit, Section I(D) (Finding 32), Section X(C).

72.      The SWPPP must include: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutants control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and a description of individuals and its current responsibilities for developing and implementing the SWPPP. Storm Water Permit, Section X.

73.     The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. Storm Water Permit, Section X.

74.     The Storm Water Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit. Storm Water Permit, Section X(A)-(B). The Storm Water Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. Storm Water Permit, Section X(B) and Section XV.

75.     The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness. Storm Water Permit, Sections I(J) (Finding 55), X(B)(1). Significant SWPPP revisions must be certified and submitted by the discharger via SMARTS within 30 days. Storm Water Permit, Section X(B)(2). Dischargers are required to submit revisions to the SWPPP that are determined to not be significant every three (3) months in the reporting year. *Id.* at Section X(B)(3); Storm Water Permit, Fact Sheet, Section II (I)(1).

**E.     The Storm Water Permit's Monitoring and Reporting Requirements**

76.     The Storm Water Permit requires facility operators to develop and implement a Monitoring Implementation Plan ("MIP"). Storm Water Permit Sections X(I) and XI(A)-XI(D). The MIP must ensure that storm water discharges are in compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the Storm Water Permit. Storm Water Permit Section XI. The

MIP must ensure that practices at the facility to prevent or reduce pollutants in storm water and authorized non-storm water discharges are evaluated and revised to meet changing conditions at the facility, including revision of the SWPPP. *Id.*

77.     Further objectives of the MIP are to ensure that BMPs have been adequately developed and implemented, revised if necessary, and to ensure that storm water and non-storm water discharges are in compliance with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. Storm Water Permit, Section XI.

78.     The MIP aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. *Id*.

79.     The Storm Water Permit requires facility operators to monitor and sample storm water discharges to ensure that the facility is complying with the terms of the permit. Storm Water Permit, Sections I(J) (Findings 55-56) and XI.

80.     Section XI(A)(4) of the Storm Water Permit require that the MIP shall be revised as necessary to ensure compliance with the Storm Water Permit.

81.     Section XI(A) of the Storm Water Permit require dischargers to conduct monthly visual observations of storm water discharges.

82.     Section XI(A)(2) of the Storm Water Permit requires dischargers to document the presence of any floating and suspended materials, O&G, discolorations, turbidity, or odor in the discharge, and the source of any pollutants in storm water discharges from the facility. Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges. *See* Storm Water Permit, Section XI(A)(3). The Storm Water Permit also requires dischargers to revise the SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility. Storm Water Permit, Section X(B)(1).

83.   The Storm Water Permit requires dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged. Storm Water Permit Section XI(B)(4).

84.   Section XI(B)(1) of the Storm Water Permit requires sampling if a precipitation event produces a discharge for at least one drainage area, and it is preceded by forty-eight (48) hours with no discharge from any drainage area ("Qualifying Storm Event" or "QSE").

85.   Section XI(B)(2) of the Storm Water Permit requires dischargers to collect and analyze storm water samples from two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

86.   Section XI(B)(6) of the Storm Water Permit requires dischargers to analyze storm water samples for TSS, O&G, pH, additional parameters identified by the discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment, additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved TMDLs, and additional parameters required by the Regional Water Board.

87.   The Facility's January 2017 SWPPP requires testing only for pH, TSS, and O&G.

88.   The Facility's 2015 NOI classifies the Facility under Standard Industrial Classification codes ("SIC") 2841 (Soaps and other detergents, except specialty cleaners), 2844 (Perfumes, cosmetics, and other toilet preparations), and 2834 (Pharmaceutical Preparations); SIC codes 2841 and 2844 obligate the Facility to additionally sample for N+N and Zn, but upon information and believe, the Operators have not done so over at least the past five years.

89.   Section XVI of the Storm Water Permit requires dischargers to submit an annual report with a Compliance Checklist that indicates whether a Discharger complies with, and has addressed all applicable requirements of this General Permit, an

explanation for any non-compliance of requirements within the reporting year, as indicated in the Compliance Checklist, an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the reporting year, and the date(s) of the Annual Evaluation.

## V.   STATEMENT OF FACTS

### A. Facility Site Description

90.     Defendant operates an industrial facility located at 5755 W. 96th Street, 5760 W. 96th Street and on other adjacent parcels in Los Angeles, CA 90045.

91.     The Facility generally consists of a primary manufacturing building (BLDG 5755), a custom packaging/soaps building (BLDG 5760), a chemical warehouse (BLDG 5733), a research and development building (BLDG 5800), a component warehouse (BLDG 5771), an information management building (BLDG 5705), a machine shop, waste storage areas, waste water treatment areas, loading docks and parking areas, among other mostly industrial areas.

92.     The Facility NOI states that the site is approximately 14 acres, with approximately 7.5 acres exposed to storm water. The Facility's general purpose consists of the manufacture of consumer pharmaceutical products.

93.     Pursuant to the Facility NOI the SIC codes for the Facility are 2841 (Soaps and other detergents, except specialty cleaners), 2844 (Perfumes, cosmetics, and other toilet preparations), and 2834 (Pharmaceutical Preparations). According to the current Facility SWPPP prior to October, 2020, the Facility is only classified under SIC code 2834 (Pharmaceutical Preparations).

94.     Under SIC Code 2834, the General Permit requires to analyze storm water samples at Facility for TSS, pH, O&G. Under SIC codes 2841 and 2844 the Facility must sample for TSS, pH, O&G, Zn, and N+N. Facilities must also sample and analyze for additional parameters identified on a facility-specific basis to reflect a facilities' pollutant source assessment, as required by the General Permit and the Regional Board, and

additional parameters related to receiving waters with 303(d) listed impairments. Storm Water Permit, Section XI.B.6.

95.    LA Waterkeeper is informed and believes, and thereon alleges, that industrial activities at Facility include the following: product compounding and manufacturing, product filling, water purification, operation of a raw material tank farm, operation of the product tank farm, storm water drainage and tanker truck unloading, wastewater treatment, operation of waste storage yards, operation of receiving docks, operation of a maintenance yard, use of outdoor trash containers, soap processing, product transfers, use of outdoor recycling areas, operation of an aqueous firefighting foam tanks, use of purified water tank storage and neutralization system storage, and operation of an industrial compressor.

96.    LA Waterkeeper is informed and believes, and thereon alleges, that pollutant sources contributing to storm water contamination at the Facility include, but are not limited to: industrial dust and debris; pollutants from outdoor loading and unloading of industrial materials and finished product, storage of chemicals, waste, hazardous waste, process water, raw materials and other industrial materials, and transport of same through the Facility as required to meet Facility production goals; pollutants from tank farms, heavy traffic, building exhaust, and kettles, dirt and particulate from industrial and other vehicles; and deteriorating asphalt surfaces that trap sediment, released when contacted with storm water.

97.    According to the Facility SWPPP, the Facility has a total of eight (8) or nine (9) discharge points that flow into Los Angeles County Municipal Separate Storm Sewer System ("MS4") drains on 96th Street, 98th Street and Bellanca Street which flow into the Dominguez Channel which empties into the Dominguez Channel Estuary, the Los Angeles Harbor, and the Pacific Ocean.

98.    Dominguez Channel, Dominguez Channel Estuary, the Los Angeles Harbor, and the Pacific Ocean are waters of the United States within the meaning of the CWA.

**2.    Dominguez Channel and the Los Angeles Harbor**

99.     Dominguez Channel is a 15.7-mile stream in southern Los Angeles County, California, that drains approximately 43,400 acres. The watershed area is over 90% developed, largely residential, and artificially bounded by a system of storm drains and flood control channels. The stream begins just south of 116th Street in Hawthorne and travels through Gardena, Alondra Park, Torrance, Harbor Gateway, Carson, Wilmington, and empties into Dominguez Channel Estuary, the Los Angeles Harbor and the Pacific Ocean.

100.   LA Waterkeeper and its member utilize the Dominguez Channel, Dominguez Channel Estuary, the Los Angeles Harbor and the Pacific Ocean for research, study, and recreation.

101.   The Dominguez Channel provides critical habitat for species, including many that are endangered, threatened, rare, and endemic to Southern California. The concrete-lined sections provide wading habitat for shorebirds that have few other options, given that the majority of Los Angeles' wetlands have been destroyed. The Dominguez Channel estuary provides a rich brackish habitat at the intersection of freshwater and saltwater environments. These habitats remain vulnerable, however. Past habitat destruction and pollution have led to the extirpation of many species, including the western pond turtle and the steelhead trout, and many species listed here may be extirpated in the near future.

102.   Los Angeles Harbor is the outlet for the Dominguez Channel. The surrounding area was formerly wetlands but is now heavily developed. Nonetheless, it supports diverse fish and benthic populations and is a nursery area for juvenile fish. Basin Plan, 1-38. The endangered California least tern nests in the harbor. *Id.* The Los Angeles Harbor and the adjacent Pacific Ocean support a diverse population of marine life and fish. *Id.* Ample recreational opportunities exist in and around the harbor, including water contact sports such as kayaking, sailing, stand-up paddle boarding, rowing, and jet skiing, and other activities such as walking, bicycling, boating.

**B. The Facility Storm Water Permit Coverage**

103.   The State Board's electronic database, called the Storm Water Multiple Application & Report Tracking System ("SMARTS"), lists the current Facility Waste Discharge Identification ("WDID") number for the Facility as 4 19I010364. SMARTS lists the Facility coverage under the Storm Water Permit as "Active."

104.   The NOI for the Facility lists the Receiving Water as the Pacific Ocean.

105.   Via search of the SMARTS database, LA Waterkeeper obtained a SWPPP for the Facility dated January 2017 ("Facility SWPPP").

106.   LA Waterkeeper is informed and believes, and thereon alleges, that the Facility SWPPP fails to describe and/or adequately describe all of the industrial activities and significant materials at the Facility

107.   LA Waterkeeper is informed and believes, and thereon alleges, that Facility Operators have failed to evaluate pollutants and their sources on site and implement BMPs that achieve compliance with Storm Water Permit or the CWA.

108.   LA Waterkeeper is informed and believes, and thereon alleges, that pollutants associated with the Facility include, but are not limited to: pH, TSS, O&G, Zn, N+N.

109.   LA Waterkeeper is informed and believes, and thereon alleges, that without properly identifying all industrial activities or all significant materials at Facility in the SWPPP, the Operators have not developed and/or implemented all appropriate BMPs.

110.   LA Waterkeeper is informed and believes, and thereon alleges, that the Facility SWPPP failed to implement the minimum BMPs required by the General Permit, including: sufficient good housekeeping requirements; preventive maintenance requirements; aerial deposition control; material handling and waste management requirements; employee training and quality assurance; and record keeping.

111.   LA Waterkeeper is informed and believes, and thereon alleges, that the Facility has further failed to implement advanced BMPs necessary to reduce or prevent discharges of pollutants in its storm water sufficient to meet the BAT/BCT standards, including: exposure minimization BMPs; containment and discharge reduction BMPs;

treatment control BMPs; or other advanced BMPs necessary to comply with the General Permit's effluent limitations. Storm Water Permit, Sections X.H.2.

112.   LA Waterkeeper is informed and believes, and thereon alleges, that there are minimal BMPs implemented or planned for implementation, pursuant to the Facility SWPPP.

113.   LA Waterkeeper is informed and believes, and thereon alleges, that Defendant has failed to collect sufficient storm water samples for analyses, in violation of the Storm Water Permit, since at least August 12, 2015.

114.   LA Waterkeeper is informed and believes, and thereon alleges, that violations of Zn, N+N, Fe, N+N, TSS, and Al occur each time storm water or non-storm water discharges from Facility in violation of the Storm Water Permit Discharge Prohibitions III.C and III.D, Receiving Water Limitations VI.A, VI.B.

115.   LA Waterkeeper is informed and believes, and thereon alleges, that the repeated and significant exceedances of Benchmark Levels demonstrate that the Operators have failed and continue to fail to develop and/or implement BMPs to prevent the exposure of pollutants to storm water and to prevent discharges of polluted storm water and non-storm water from the Facility.

116.   LA Waterkeeper is informed and believes, and thereon alleges, that the Operators have failed and continue to fail to evaluate the effectiveness of its BMPs and adequately revise the Facility SWPPP, despite repeated and significant concentrations of pollutants in Facility's storm water discharges. Further, Defendant has failed to make changes to the Facility's training programs, or make any other changes based upon events that would signal a need for required revisions or alteration of practices.

117.   LA Waterkeeper is informed and believes, and thereon alleges, that pollutants, including but not limited to those referenced herein, have been and continue to be tracked throughout the Facility's operation areas.

118.   LA Waterkeeper is informed and believes, and thereon alleges, that the Operators' failure to properly address pollutant sources and pollutants results in the

exposure of pollutants associated with its industrial activities to precipitation, and that this results in discharges of polluted storm water from Facility and into local waterways in violation of the Storm Water Permit and/or the CWA.

119.   LA Waterkeeper is informed and believes, and thereon alleges, that the Operators' failure to properly address these pollutants and its sources results in the exposure of pollutants to precipitation, which carries these pollutants with storm water flows from Facility into the Receiving Waters.

### D.   Storm Water Discharges from the Facility

120.   As discussed above and as detailed in the Facility SWPPP, the Facility has a total of eight (8) or nine (9) discharge points more fully described in **Exhibit A**, that flow into Los Angeles County MS4 system which flows to the Dominguez Channel which empties into the Dominguez Channel Estuary, the Los Angeles Harbor, and the Pacific Ocean.

121.   Discharge points identified as drainage areas from Runoff No. 1 through Runoff No. 6 discharge polluted storm water onto 96th Street which enters three (3) MS4 drains on 96th Street; these drainage areas are each within the main Facility footprint, consisting of all buildings but the information management building, bounded by 96th Street and Arbor Vitae Street to the south and north.

122.   Discharge points identified as Runoff No. 8 and Runoff No. 9 discharge polluted storm water from the information management building which features a large loading dock and is bounded by 98th Street and Bellanca Avenue to the south and east.

123.   LA Waterkeeper is informed and believes and thereon alleges that the Facility has self-reported over thirty-five (35) NAL exceedances of TSS, two (2) Instantaneous NAL exceedances and ten (10) Basin Plan exceedances of pH, and one (1) Instantaneous NAL exceedance of O&G, over the past five (5) reporting years at the Facility.

124.   LA Waterkeeper is informed and believes and thereon alleges that the Facility is required to sample for N+N and Zn, but the Operators do not sample for those

constituents, and that discharges of polluted storm water also contain impermissible levels of N+N, Zn, Al, and Fe.

### E. The Facility' Storm Water Discharges to the Receiving Waters Contain Elevated Levels of Pollutants

125.   LA Waterkeeper is informed and believes, and thereon alleges, that pollutants from the Facility discharge into Dominguez Channel.

126.   The EPA promulgated regulations for the Section 402 NPDES permit program defining waters of the United States. *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce. The CWA requires any person who discharges or proposes to discharge pollutants into waters of the United States to submit an NPDES permit application. 40 C.F.R. § 122.21.

127.   LA Waterkeeper is informed and believes, and thereon alleges, Dominguez Channel which flows to and empties into the Dominguez Channel Estuary, the Los Angeles Harbor and the Pacific Ocean, herein, are waters of the United States, and/or a tributary to a traditionally navigable water.

128.   LA Waterkeeper is informed and believes, and thereon alleges, that polluted storm water and non-storm water discharges from the Facility to the Receiving Waters.

129.   Storm water discharges containing pollutants, including but not limited to, heavy metals such as Zn, Fe, and Cu adversely affect the aquatic environment.

130.   Samples of storm water discharges collected at the Facility contain pollutants including TSS, pH and O&G in excess of levels known to adversely impact aquatic species and the environment, federal regulations, WQS, Benchmarks, and the CTR in violation of the Storm Water Permit's Effluent Limitations and Receiving Water Limitations.

131.   LA Waterkeeper is informed and believes, and thereon alleges, that during

and/or after every significant rain event[3] or any other storm water or non-storm water discharge that has occurred at the Facility since August 12, 2015, through the present, Defendant has discharged and continues to discharge storm water and non-storm water from the Facility that contains concentrations of pollutants at levels that violate the prohibitions and limitations set forth in the Storm Water Permit, the Federal Effluent Limitations, the Benchmarks, CTR, and the WQS.

### F.    Defendant's Failure to Comply with the Storm Water Permit's Sampling, Reporting, and Monitoring Requirements

132.    LA Waterkeeper is informed and believes, and thereon alleges, that Defendant failed and continues to fail to develop an adequate Monitoring Implementation Plan ("MIP") for industrial operations at the Facility that complies with Section XI of the Storm Water Permit.

133.    LA Waterkeeper is informed and believes, and thereon alleges, that Defendant failed and continues to fail to revise the MIP for the Facility as necessary to ensure compliance with Section XI of the Storm Water Permit.

134.    LA Waterkeeper is informed and believes, and thereon alleges, that Defendant failed and continues to fail to collect or analyze sufficient storm water samples at the Facility, in violation of Section XI of the Storm Water Permit.

135.    LA Waterkeeper is informed and believes, and thereon alleges, that Defendant has failed and continues to fail to sample storm water discharges from all discharge locations, in violation of Sections XI(B) and XI(C) of the Storm Water Permit.

136.    LA Waterkeeper is informed and believes, and thereon alleges, that Defendant failed and continues to fail to adequately revise the MIP for the Facility as necessary to ensure compliance with the Storm Water Permit in violation of Sections XI(B) and XI(C) of the Storm Water Permit.

137.    LA Waterkeeper is informed and believes, and thereon alleges, that the

---

[3] A significant rain event is an event that produces stormwater runoff, which according to EPA occurs with more than 0.1 inches of precipitation.

Complaint for Declaratory and Injunctive     26
and Civil Penalties Relief

Operators of the Facility consistently fail to perform visual observations of storm water during QSEs.

138.   LA Waterkeeper is informed and believes, and thereon alleges, that the Operators of the Facility have consistently failed and continue to fail to report any noncompliance with the Storm Water Permit at the time that the Annual Report is submitted.

139.   LA Waterkeeper is informed and believes, and thereon alleges, that the Operators did not report their non-compliance as required by the Storm Water Permit.

140.   LA Waterkeeper is informed and believes, and thereon alleges, that the Operators of the Facility fail to collect sufficient storm water samples during QSEs.

141.   Information available to LA Waterkeeper also suggests that the BMPs proffered as implemented in the Facility SWPPP are insufficient and ineffective in reducing pollutants to levels compliant with the Storm Water Permit and/or the CWA.

142.   LA Waterkeeper is informed and believes, and thereon alleges, that Defendant has failed to submit complete Annual Reports to the Regional Board for the past five reporting years in violation of Section XVI of the Storm Water Permit.

## VI.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Discharges of Contaminated Storm water in Violation of the Storm Water Permit's Effluent Limitations and the Clean Water Act. 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

143.   LA Waterkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

144.   LA Waterkeeper is informed and believes, and thereon alleges, that Defendant failed and continues to fail to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of BMPs that achieve BAT/BCT.

145.   LA Waterkeeper is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that do not achieve compliance

with BAT/BCT standards from the Facility occur every time storm water discharges from the Facility. Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the Storm Water Permit and the CWA. *See* Storm Water Permit, Section I(D) (Finding 32), Effluent Limitation V(A); 33 U.S.C. § 1311(b).

146.   The Operators violate and will continue to violate the Storm Water Permit's Effluent Limitations each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Facility.

147.   LA Waterkeeper is informed and believes, and thereon alleges, that the Operators' violations of Effluent Limitations of the Storm Water Permit and the CWA are ongoing and continuous.

148.   Each day since at least August 12, 2015 that the Operators discharge storm water containing pollutants in violation of the Storm Water Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

149.   By committing the acts and omissions alleged above, the Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from August 12, 2015 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

150.   An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm LA Waterkeeper has no plain, speedy, or adequate remedy at law.

151.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## SECOND CAUSE OF ACTION

**Defendant's Discharges of Contaminated Storm water in Violation of the Storm Water Permit's Receiving Water Limitations and the Clean Water Act. 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

152.   LA Waterkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

153.   LA Waterkeeper is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment from the Facility occur each time storm water discharges from the Facility.

154.   LA Waterkeeper is informed and believes, and thereon alleges, that storm water containing levels of pollutants that cause or contribute to exceedances of water quality standards has discharged and continues to discharge from the Facility each time storm water discharges from the Facility.

155.   The Operators violate and will continue to violate the Storm Water Permit's Receiving Water Limitations each and every time storm water containing levels of pollutants that adversely impact human health and/or the environment, and that cause or contribute to exceedances of WQS, discharges from the Facility.

156.   LA Waterkeeper is informed and believes, and thereon alleges, that the Operators' violations of Receiving Water Limitations of the Storm Water Permit and the CWA are ongoing and continuous.

157.   Each and every violation of the Storm Water Permits' Receiving Water Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

158.   By committing the acts and omissions alleged above, the Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from August 12, 2015 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

159.   An action for injunctive relief under the Clean Water Act is authorized by Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

160.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

### THIRD CAUSE OF ACTION
**Defendant's Failure to Adequately Develop, Implement, and/or Revise a Storm Water Pollutant Prevention Plan in Violation of the Storm Water Permit and the Clean Water Act.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

161.   LA Waterkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

162.   LA Waterkeeper is informed and believes, and thereon alleges, that the Operators have failed and continue to fail to develop an adequate SWPPP for the Facility, in violation of the Storm Water Permit.

163.   LA Waterkeeper is informed and believes, and thereon alleges, that the Operators have failed and continue to fail to adequately implement a SWPPP for the Facility, in violation of the Storm Water Permit.

164.   LA Waterkeeper is informed and believes, and thereon alleges, that Operators have failed and continue to fail to adequately revise the SWPPP for the Facility, in violation of the Storm Water Permit.

165.   The Operators have been in violation of the Storm Water Permit at the Facility every day from August 12, 2015 to the present.

166.   The Operators' violations of the Storm Water Permit and the CWA at the Facility are ongoing and continuous.

167.   The Operators will continue to be in violation of the Storm Water Permit and the CWA each and every day the Operators fail to adequately develop, implement, and/or revise the SWPPP for the Facility.

168.   Each and every violation of the Storm Water Permit's SWPPP requirements at the Facility is a separate and distinct violation of the CWA.

169.   By committing the acts and omissions alleged above, the Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from August 12, 2015 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

170.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm LA Waterkeeper, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

171.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## FOURTH CAUSE OF ACTION
**Defendant's Failure to Adequately Develop, Implement, and/or
Revise a Monitoring and Reporting Plan in Violation of
the Storm Water Permit and the Clean Water Act.
U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

172.   LA Waterkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

173.   LA Waterkeeper is informed and believes, and thereon alleges, that the Operators have failed and continue to fail to develop an adequate MIP for the Facility, in violation of the Storm Water Permit.

174.   LA Waterkeeper is informed and believes, and thereon alleges, that the

Operators have failed and continue to fail to adequately implement an MIP for the Facility, in violation of the Storm Water Permit.

175.   LA Waterkeeper is informed and believes, and thereon alleges, that the Operators have failed and continue to fail to adequately revise an MIP for the Facility, in violation of the Storm Water Permit.

176.   The Operators have been in violation of the Storm Water Permit's monitoring requirements at the Facility every day from August 12, 2015 to the present.

177.   The Operators' violations of its Storm Water Permit's monitoring requirements and the CWA at the Facility are ongoing and continuous.

178.   The Operators will continue to be in violation of Section XI of the Storm Water Permit, and the CWA each and every day they fail to adequately develop, implement, and/or revise an MIP for the Facility.

179.   Each and every violation of the Storm Water Permit's MIP requirements at the Facility is a separate and distinct violation of the CWA.

180.   By committing the acts and omissions alleged above, the Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from August 12, 2015 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

181.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm LA Waterkeeper, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

182.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties. WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

**FIFTH CAUSE OF ACTION**

**Defendant's Failure to Report as Required by the Storm Water
Permit in Violation of the Storm Water Permit and the
Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

183.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

184.   Section XI(B)(2) of the Storm Water Permit requires a discharger to collect and analyze storm water samples from two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30). Dischargers are required to submit the storm water sample analyses to the State Board and Regional Board.

185.   Section XI(B)(6) of the Storm Water Permit requires dischargers to analyze storm water samples for TSS, O&G, pH, additional parameters identified by the discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment, additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved TMDLs, and additional parameters required by the Regional Board.

186.   Section XVI of the Storm Water Permit requires a discharger to certify and submit via SMARTS an Annual Report no later than July 15th following each reporting year using the standardized format and checklists in SMARTS and include: 1) a compliance checklist that indicates whether a discharger complies with, and has addressed all applicable requirements of this General Permit; 2) an explanation for any non-compliance of requirements within the reporting year, as indicated in the compliance checklist; and an identification, including page numbers and/or sections, of all revisions made to the SWPPP within the reporting year.

187.   Section XII(C) of the Storm Water Permit requires a discharger to execute a Level 1 Exceedance Response Actions ("ERA") Evaluation and prepare a Level 1 ERA Report should they exceed a Numeric Action Level ("NAL") for any required sampling and analysis parameter under the Storm Water Permit, or  the Storm Water Permit

requires a Level 2 ERA and the preparation of a Level 2 ERA Report should they exceed a NAL for two consecutive reporting years, for any required sampling and analysis parameter under the Storm Water Permit. The ERA Evaluation should identify additional BMPs and SWPPP revisions needed to prevent future NAL exceedances and comply with the Storm Water Permit. Based upon the ERA Evaluation(s), the discharger shall as soon as practicable, but not later than January 1, submit an ERA Report and certify that the ERA Report includes: 1) a summary of the ERA Evaluation, 2) a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded a NAL. Level 2 ERA reports require more stringent requirements than a Level 1 ERA report.

188.   LA Waterkeeper is informed and believes, and thereon alleges, that the Facility Operators have failed and continue to fail to sufficiently sample and analyze storm water in any reporting year at issue in this Complaint.

189.   LA Waterkeeper is informed and believes, and thereon alleges, that the Facility Operators have failed and continue to fail to submit accurate Annual Reports to the Regional Board, in violation of Sections XI and XVI of the Storm Water Permit.

190.   LA Waterkeeper is informed and believes, and thereon alleges, that the Facility Operators failed and continue to fail to submit sufficient ERA Reports to the Regional Board for the Facility, despite repeat storm water sample analysis requiring BMP upgrades at the Facility, in violation of Section XII(C) of the Storm Water Permit.

191.   LA Waterkeeper is informed and believes, and thereon alleges, that the Facility Operators' Annual Reports failed and continue to fail to meet the monitoring and reporting requirements of the Storm Water Permit, in violation of Sections XI and XVI of the Storm Water Permit.

192.   LA Waterkeeper is informed and believes, and thereon alleges, that the Operators of the Facility have failed and continue to fail to submit complete Annual Reports to the Regional Board, in violation of Sections XI and XVI of the Storm Water Permit.

193.   The Facility Operators have been in violation of Sections XI, XII and XVI of the Storm Water Permit since at least August 12, 2015.

194.   The Facility Operators have been in violation of the reporting requirements of the Storm Water Permit each day it has operated the Facility without reporting as required by Receiving Water Limitations and Sections XI, XII(C) and XVI of the Storm Water Permit.

195.   The Operators have been in violation of Sections XI, XII(C) and XVI of the Storm Water Permit since at least August 12, 2015.

196.   The Operators' violations of the reporting requirements of the Storm Water Permit and the CWA are ongoing and continuous.

197.   By committing the acts and omissions alleged above, the Operators of the Facility are subject to an assessment of civil penalties for each and every violation of the CWA occurring from August 12, 2015 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

198.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm LA Waterkeeper, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

199.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## VII.   **RELIEF REQUESTED**

200.   Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.      A Court order declaring Defendant to have violated and to be in violation of Sections 301(a) and (b) and 402 of the Clean Water Act, 33 U.S.C. §§

1311(a) and (b); for its unlawful discharges of pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent standards limitations which include BAT/BCT requirements, and for failing to comply with the substantive and procedural requirements of the Storm Water Permit and the CWA.

b.      A Court order enjoining Defendant from violating the substantive and procedural requirements of the Storm Water Permit and Sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342;

c.      A Court order assessing civil monetary penalties for each violation of the CWA occurring prior to November 2, 2015 at $37,500 per day per violation, as permitted by 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4 (2009);

d.      A Court order assessing civil monetary penalties for each violation of the CWA occurring on or after November 2, 2015 of $55,800 per day, as permitted by 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4 (2016);

e.      A Court order awarding Plaintiff its reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

f.      Any other relief as this Court may deem appropriate.

Dated: April 12, 2021                    Respectfully submitted,


                                         _____
                                         Anthony M. Barnes
                                         AQUA TERRA AERIS LAW GROUP
                                         Attorneys for Plaintiff
                                         LOS ANGELES WATERKEEPER